# Affidavit in Support of an Application for Search Warrant

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH THE PREMISES AT xxxx X STREET NORTHEAST, APARTMENT #x, WASHINGTON, D.C.**

> The premises are further described as follows: xxxx X Street Northeast, apartment #x, which is a red brick multi-story apartment building with a white front door, with the numbers "xxxx" attached to the structure of the building over the entryway. As you enter the building, apartment #x is located at the top of the stairs, to the immediate right, is a white door with the number x affixed in black lettering.

I, King Watts, a Detective with the Metropolitan Police Department (MPD), in Washington, D.C., first being duly sworn, do hereby depose, aver, and state:

1. This affidavit is submitted in support of an application for a warrant to search the apartment number four, at xxxx X Street N.E., Washington, D.C., because there is probable cause to believe that in this apartment there now can be found illegally possessed firearms, ammunition, as well as documents and other evidence of violations of the District of Columbia criminal laws forbidding the possession of unregistered firearms and ammunition, including D.C. Code § 22-4504, as well as violations of federal law forbidding the possession of firearms or ammunition after a conviction for an offense punishable by a term of imprisonment of more than one year, 18 U.S.C. § 922(g)(1).

## I. AFFIANT'S EXPERIENCE

2. I have been a sworn officer with MPD since 1989. My current rank is a detective, grade two, assigned to the Major Narcotic Branch (MNB) of the Criminal Investigations Division, or its predecessors, including NSID, since May 1997. Before this assignment, worked with the Drug Enforcement Administration Task Force (DEA) for two years, specializing in large scale narcotic trafficking in and around the Washington Metropolitan area. Additionally, received training with the Federal Bureau of Investigations (FBI) and have worked several cases which involved narcotic trafficking. Prior to this, I received training thru the Metropolitan Police Departments Institute of Police Science on Gun Recovery and was a member of the MPD's Gun Recovery Unit, and initiated numerous gun-recovery investigations. Throughout my law enforcement career, I have attended classes, seminars, and special training sessions concerning the firearms laws of the District of Columbia and the U.S. Federal Government. Additionally, I now work with a number of detectives who formerly have served on specialty gun enforcement and recovery police units, and my knowledge is based on things I have learned from them. I either know the information set forth in this affidavit from what I have observed, or other sworn law enforcement officers have recounted it to me. In the rest of this affidavit, when first-person pronouns are used, they refer to me.

3.    Based upon the my professional training, my experience as an officer enforcing criminal laws against illegal gun possession, and my work with other veteran police officers and detectives, I can state the following:

A.  That such gun possessors buy or get and keep in storage extra ammunition for their firearms, beyond the immediate capacity of the particular gun; and, that they keep such additional ammunition in their homes; among the main reasons for this is that the smallest amount of bullets that commonly can be bought from a gun shop is a 50-round box or brick; this is a standard size bought at gun shops bordering the District of Columbia in Prince Georges County, Md.; the gun shops in Prince Georges County are the closest and most convenient source of ammunition for persons with guns in the area of the MPD Fifth and Seventh Districts; few if any guns have a capacity of 50 rounds, and thus most persons who have guns in the Fifth District, or elsewhere in Washington, D.C., must have bullets kept or stored outside a gun that is being carried personally; this location borders Prince Georges County, Maryland;

B.  That gun possessors involved in the drug trade, as defendant NAPPERS appears to have been, usually prefer large capacity firearms, and thus normally have a spare supply of ammunition at home or very close to hand in addition to the magazine or clip of rounds loaded in the weapon itself; in particular, because semi-automatic weapons can be loaded in volume using magazine clips much more quickly than revolvers can be loaded with individual bullets, semi-automatic pistols are favored by persons in the drug trade; this results in a great likelihood that the possessor of a semi-automatic pistol will have spare magazines of ammunition at home if he is not carrying it to hand; at the time of his arrest, defendant NAPPER was carrying illegally two .380 caliber semi automatic pistols, he had crack cocaine and marijuana , along with additional rounds of ammunition on his person.

C.  That persons who keep or carry guns illegally commonly retain items associated with their firearms long after they have bought or got the guns, including the original manufacturer's packaging, gun-cleaning equipment, and additional parts, such as gun-sights; and, that these are almost always stored in the gun-possessor's home; in particular, gun-cleaning equipment, which is excellent evidence of illegal gun possession, normally is not carried on a person with a gun, but kept at home, to be used periodically to keep a gun "in shape" or good working order;

D.  That, it is quite common for a person who possesses one firearm to own or possess additional guns, and, that it is common for a person who is found carrying a firearm on his person to have stored at home one or more additional firearms, along with additional ammunition, and papers related to the acquisition of that firearm;

E.  That many persons who illegally possess guns often have pictures taken of themselves individually or of themselves with friends in which they display their gun or guns, and that these pictures, themselves excellent evidence of illegal gun possession, commonly are kept at the gun possessor's home or in their room at their homes, along with gun paraphernalia; and

F.  That, even after an individual's arrest for gun-related charges, the person's family and associates commonly do not dispose of other firearms or ammunition; and, even if they do get rid of other guns, they are much less likely to get rid of ammunition, possession of which almost always is a crime in Washington, D.C.; further, that hardly ever do such associates remove or get rid of gun packaging or cleaning equipment or photographs of a person with a gun; and that such items will remain at the arrested individual's home for a considerable period of time after such an arrest.

## II. STATEMENTS OF FACTS

4.      On Thursday August 4, 2005 at approximately 14:20 p.m., at the Greyhound Bus Station, 1005 I Street Northeast, Washington, DC, members of MPD Drug Interdiction Unit, Major Narcotics Branch, were conducting interviews and observed Carolina Trailways Bus# 85779 arrive at the station. This bus route started in Philadelphia, PA and ends at Norfolk, VA. Officer Mcfadden observed a male subject exit the aforementioned bus and instead of entering the station, as normal passengers do, the male subject walked around the east end of the station. Officer Mcfadden and Officer Alvarado observe the male subject later identified as DARRICK NAPPER, walk past the smoking area and continue to walk towards L street NE. Officers called out to Mr. NAPPER. Mr. Napper stopped. Officers Mcfadden and Alvarado were wearing plain clothes, identified themselves as police officers by displaying identification folders. Officer Alvarado asked Mr. NAPPER if he could speak to him. Mr. NAPPER stated "yeah". Officer Alvarado asked Mr. NAPPER if he had just exited one of the buses that had just arrived. Mr. NAPPER stated "no". Officer Alvarado asked Mr. NAPPER what was he doing at the bus station. Mr. NAPPER stated he had been waiting for someone. When asked why he was not waiting in the station, Mr. NAPPER had no answer. Officer Alvarado asked Mr. NAPPER if he had any identification with him. Mr. NAPPER stated "no". When asked if he lived in the District (of Columbia), Mr. NAPPERS said "16th & E". Officer Alvarado explained the mission of the Interdiction Unit to Mr. NAPPER. Mr. NAPPER acknowledged his understanding by saying "oh, right". Mr. NAPPER was asked if he was carrying any weapons of mass destruction, any guns, drugs or body parts. Mr. NAPPER said "no". Officer Alvarado asked for permission to search the only bag that Mr. NAPPER was carrying. Mr. NAPPER stated "yeah". Officer Alvarado was given the bag and placed it on the ground. Officer Mcfadden then asked Mr. NAPPER if he was in the area for the first time. Mr. NAPPER stated "yes". Officer Alvarado opened the bag and observed what he recognized as a box of ammunition. Officer Alvarado gave the alert signal to Officer Mcfadden to control Mr. NAPPER. Officer Mcfadden immediately called out that Mr. NAPPER had a gun on him. Mr. NAPPER was handcuffed and placed under arrest. Search incident to arrest revealed that Mr. NAPPER had in his front pants waistband one Ruger 9mm semi automatic pistol with 9 rounds of .380 caliber live rounds of ammunition in the chamber. Additionally, in his waistband was a black canvass holster with one extra magazine loaded with 10 rounds of 380 caliber ammo. From his left cargo pants pocket was recovered 31 small plastic ziplocks each containing a rock substance, an additional bag with 11 small ziplocks of a rock substance. Portions of this evidence field tested positive for the presence of cocaine. Mr. NAPPER also possessed a plastic bag containing a plant substance, a portion of which tested positive for the presence of THC found in marijuana. And also from his person $591.72 from his pants pocket and four more rounds of ammunition. From Mr. NAPPER'S bag was recovered

another 380 caliber semi automatic pistol, a magazine with eight additional 380 caliber rounds of ammunition, a box containing 37 rounds of 9mm ammunition, one body armor vest, one digital scale, two black masks, and additional drug packaging paraphernalia. Mr. NAPPER is a convicted felon with prior drug conviction in US District Court and has a pending distribution of cocaine matter pending in DC Superior Court at this time. He has no license to carry the pistol found in his possession, and carrying such a pistol without a license is a violation of the District of Columbia criminal code, specifically D.C. Code § 22-4504.  Further, the gun was not registered to defendant, as required under District of Columbia, so its possession and that of the ammunition in it, was a criminal act under D.C. Code §§ 7-2502.01 (prohibition of possession of unregistered firearm), 7-2506.01 (prohibition of possession of ammunition unless possessor holds valid registration for firearm), and 7-2507.06 (criminal penalties).

5. During the interview of DARRICK NAPPER he gave xxxx X Street NE Washington, DC apartment # x as his home residence. Postal Inspectors Office has verified that DARRICK NAPPER receives mail at the aforementioned address.

### III. REQUEST FOR ISSUANCE OF SEARCH WARRANT:

Based upon the foregoing, I respectfully request that a judge of the Superior Court of the District of Columbia issue a warrant to search apartment # x, at xxxx X Street, N.E., for firearms, ammunition, gun paraphernalia, and paperwork and evidence concerning the illegal possession of firearms and ammunition, as well as paperwork and other evidence concerning the ownership of and residence at that address.

Further than this, affiant sayeth not.          Reviewed By:

_____          _____
Det. King Watts, Affiant                          Assistant U.S. Attorney
Major Narcotics Branch

_____
**Subscribed and sworn to before me this __ day of August 2005.**

_____
**U.S. District Court Magistrate Judge**